IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

WARN INDUSTRIES, INC., an Oregon )
corporation,                     )
                                 )
        Plaintiff,             )    Case No. 05-220-KI
                                 )
  vs.                            )    OPINION AND ORDER
                                 )
RAMSEY WINCH COMPANY, an         )
Oklahoma corporation,            )
                                 )
        Defendant.             )


    David W. Axelrod
    Christopher J. Lewis
    Johnathan E. Mansfield
    Schwabe, Williamson & Wyatt, P.C.
    PacWest Center, Suites 1600-1900
    1211 S.W. Fifth Avenue
    Portland, Oregon 97204-3795

        Attorneys for Plaintiff

Page 1 - OPINION AND ORDER

Peter E. Heuser
Elizabeth A. Tedesco
Kolisch Hartwell, P.C.
520 S.W. Yamhill Street, Suite 200
Portland, Oregon 97204

    Attorneys for Defendant

KING, Judge:

Both Warn Industries, Inc. ("Warn") and Ramsey Winch Company ("Ramsey") manufacture and sell winches. In this action, Warn alleges that some of Ramsey winch products, particularly the Patriot 12000, Patriot 15000, and Patriot Profile 12000, infringe Warn's U. S. Patent No. 5,482,255 ("the '255 patent"), entitled "Winch Having Heat Dissipating Braking." Before the court are the parties' motions and cross motions concerning claim construction and infringement. I construe the four disputed terms as follows.

## FACTS

Warn manufactures large capacity electric planetary winches for the consumer market, such as front-mounted vehicle self-recovery winches for SUV-type vehicles. This type of winch requires a braking system to slow or stop the cable drum when the cable is being spooled out under a load. These applications generate a significant amount of heat inside the cable drum, where the brake is located. Warn's '255 patent design directs the heat to flow from the brake surfaces, where it is generated by friction, to the cable drum, and from the cable drum into the atmosphere.

**LEGAL STANDARDS**

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the evidence is viewed in the light most favorable to the nonmoving party. Applied Medical Resources v. U.S. Surgical Corp., 448 F.3d 1324, 1331 (Fed. Cir. 2006).

**DISCUSSION**

I.   Claim Construction

Warn alleges that Ramsey's products infringe all six claims of the '255 patent. Only the first claim is independent. The parties dispute the construction of several terms used in the paragraph discussing the stator:

> a stator *fixedly mounted* to the drum interior comprising a *heat conductive cylinder* having *a cylindrical outer surface constantly in surface-to-surface contact with a cylindrical inner surface of the drum*, and having opposed *end faces*, one of which is disposed in a plane normal to the axis of the drum, said one end surface providing the brake surface whereby axial movement of the braking member produces surface-to-surface braking engagement in the manner of a disk brake, and said cylinder further having a center opening and a brake shaft extended through said center opening.

'255 patent, 5:12-22 (disputed terms highlighted).

A.     Applicable Law

Patent infringement analysis has two steps: (1) determining the meaning and scope of the patent claims asserted to be infringed, commonly known as claim construction or interpretation; and (2) comparing the construed claims to the device accused of infringing. Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996). "It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal quotations omitted), cert. denied, 126 S. Ct. 1332 (2006).

The construction of patent claims, including terms of art within the claims, is a matter of law exclusively for the court. Markman v. Westview Instruments, Inc., 517 U.S. 370, 390 (1996). A claim is construed by first examining the intrinsic evidence: the claim language, the specification, and the prosecution history. Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996); see also Phillips, 415 F.3d at 1324 (reaffirming the approach to claim construction taken in Vitronics, Markman, and Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc., 381 F.3d 1111 (Fed. Cir. 2004)).

Terms in a claim are given their ordinary meaning to one skilled in the art unless it appears from the patent and prosecution history that the inventor used them differently. A patentee may be his own lexicographer, but any special definition given to a word must be clearly defined in the specification or file history. Vitronics, 90 F.3d at 1582. "Usually, [the specification] is dispositive; it is the single best guide to the meaning of a disputed term." Id.

Typically, the intrinsic evidence alone resolves any ambiguity in a disputed claim term. If so, it is improper to rely on extrinsic evidence such as expert testimony, inventor testimony, prior

Page 4 - OPINION AND ORDER

art not cited in the specification or file history, dictionaries, and technical treatises and articles. Id. at 1583-84. Although technical treatises and dictionaries are extrinsic evidence, the court may freely consult these resources to better understand the underlying technology, as long as their definitions do not contradict a definition found in the patent documents. Id. at 1584 n.6. In its discretion, a court may rely on prior art, whether or not cited in the specification or the file history. Prior art references may be very indicative of how those skilled in the art generally define a term. Prior art, dictionaries, and treatises, all available to the public, are preferred over opinion testimony of either attorneys or experts in the field of technology involving the patent. Id. at 1585.

Extrinsic evidence, particular expert testimony, may be used to help the court properly understand the claims as long as it is not used to vary or contradict the patent documents. If any extrinsic evidence contradicts the patent documents, it is entitled to no weight. Id. at 1584.

> Had the district court relied on the expert testimony and other extrinsic evidence solely to help it understand the underlying technology, we could not say the district court was in error. But testimony on the *technology* is far different from other expert testimony, whether it be of an attorney, a technical expert, or the inventor, on the *proper construction* of a disputed claim term, relied on by the district court in this case. The latter kind of testimony may only be relied upon if the patent documents, taken as a whole, are insufficient to enable the court to construe disputed claim terms. Such instances will rarely, if ever, occur.

Id. at 1585.

It is improper to read a limitation from the specification into the claims. Golight, Inc. v. Wal-Mart Stores, Inc., 355 F.3d 1327, 1331 (Fed. Cir. 2004) ("While claims must be construed in light of the specification, limitations from the specification are not to be read into the claims, for it is the claims that measure the invention") (internal citation omitted). "However, the line

between construing terms and importing limitations can be discerned with reasonable certainty and predictability if the court's focus remains on understanding how a person of ordinary skill in the art would understand the claim terms." Phillips, 415 F.3d at 1323. Furthermore, claims are limited to preferred embodiments only if "the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 906 (Fed. Cir.) (internal quotation omitted), cert. denied, 543 U.S. 925 (2004). Nevertheless, while it is improper to interpret a patent claim as limited to the patent's disclosed embodiments, it is also improper to construe a claim in a manner that is contrary to the patent's disclosed embodiments. Vitronics Corp., 90 F.3d at 1583.

  B.  "Fixedly Mounted"

Ramsey contends that the term "fixedly mounted" should be defined as "firmly attached in a manner that prevents relative movement between components."

Warn contends that a stator "fixedly mounted" to the drum interior means that the stator is secured so as to prevent relative rotation between the stator and the drum. Warn argues that the lock screw prevents relative rotation between the stator and the drum but axial movement along slot 76 is permitted. Warn also points to the fact that the specification documents the expectation of radial expansion due to heat.

The specification states:

> The modification [from the prior art] basically includes a cylindrical stator which is fixed within the drum. The stator is produced from heat conductive metal and is in tight surface-to-surface fixed contact with the inner surface of the drum.

'255 Patent, 2:1-4.

Page 6 - OPINION AND ORDER

> A cylindrical stator 72 is fixedly secured to the inner wall of the drum 10. A lock screw 74 is projected into slot 76 in the stator 72. However, heat will cause expansion of the stator 72 and produce a tight fit of the stator to the inner wall of the drum.

'255 Patent, 3:62-66.

The plain meaning of "fixed" would be no movement in any direction. The specification neither states that axial movement along slot 76 is expected nor gives the purpose of the slot. A lock screw inserted far enough into the slot would stop axial movement. The radial expansion from heat is clearly contemplated and will not be prevented by the lock screw.

I conclude that the term "fixedly mounted" is defined as "firmly attached in a manner that prevents relative rotation or axial movement between the stator and the drum."

C.     "Cylindrical Outer Surface Constantly in Surface-to-Surface Contact with a Cylindrical Inner Surface of the Drum"

Ramsey contends that the phrase "cylindrical outer surface constantly in surface-to-surface contact with a cylindrical inner surface of the drum" should be defined as "a cylindrical outer surface in tight contact at all times and at substantially all points with a cylindrical inner surface of the drum."

Warn argues that the phrase "cylindrical outer surface constantly in surface-to-surface contact with a cylindrical inner surface of the drum" should be construed as "at least a portion of the outer cylindrical surface of the cylinder stays in close proximity with the inner cylindrical surface of the drum sufficient to establish a heat conducting connection." According to Warn, a portion of the outer surface of the stator must be in close proximity to, if not touching, the inner cylindrical surface of the drum at all times to enable the heat conduction. Warn argues, however,

that the claim does not require direct physical contact with the drum at all points, as Ramsey contends, and that "constantly" is a temporal limitation. Warn notes the explanation in the specification that the tightness of the fit varies with the amount of heat. Further, the "surface-to-surface contact" occurs in a completely unheated state, when contact might be limited to a single line where the stator rests on the inner surface of the drum.

The phrase "surface-to-surface" is used a second time in Claim 1:

> said one end surface providing the brake surface whereby axial movement of the braking member produces surface-to-surface braking engagement in the manner of a disk brake

'255 Patent, 5:17-20.

Ramsey argues that the second use must mean physical contact between the two surfaces in order for the brake to function. Thus, it argues that the second use supports its position that "surface-to-surface" means the parts must be in actual contact. Claim terms are presumed to be used consistently throughout a patent. Research Plastics v. Federal Packaging, 421 F.3d 1290, 1295 (Fed. Cir. 2005). Warn agrees with the legal proposition but argues that the second usage of the phrase does not support Ramsey's contention that the contact of the stator and the drum must be "substantially at all points." In particular, Warn argues that the braking contact is tight when the brake pad is cammed fully into the brake surface and less tight when the brake pad is not fully cammed into the brake surface.

I agree that the second use supports the contention that there must be actual contact, or in the case of the second use, the braking engagement would not take place. I do not agree, however, that it supports the contention that the contact must be "substantially at all points."

Page 8 - OPINION AND ORDER

Ramsey argues that the specification describes the fluid conduction of heat between the stator and the drum as though they were one unified metal object.

> The modification [of the prior art] basically includes a cylindrical stator which is fixed within the drum. The stator is produced from heat conductive metal and is in tight surface-to-surface fixed contact with the inner surface of the drum.

'255 Patent, 2:1-4.

> The stator is in effect an extension of the drum in that heat generated by the pad acting against the end surface is conducted through the stator material to the drums outer surface.

'255 Patent, 2:18-21.

> However, heat will cause expansion of the stator 72 and produce a tight fit of the stator to the inner wall of the drum.

'255 Patent, 3:62-66.

> The stator 72 is a highly heat conductive metal material that conducts heat from the faces 80,82 to the drum 10, through the drum wall and thus to the atmosphere.

'255 Patent, 4:41-45.

Certainly the dissipation of heat is an important objective of the '255 patent. The claims specify structure to accomplish the objective. There is no guarantee, however, that the claims specify the most efficient way to attain the objective.

Ramsey argues that the prosecution history supports its interpretation requiring contact "at all times" and "at substantially all points" because Warn had to distinguish U.S. Patent 5,261,646 ("the '646 patent").

Warn contends that the May 3, 1995 Amendment Ramsey cites was to contrast the '646 patent from the '255 application concerning the constancy of the contact and the conductivity of

Page 9 - OPINION AND ORDER

the stator material.  Warn notes that the Amendment resulted in changes to the claims requiring the stator to be "constantly" in surface-to-surface contact and made from "heat conductive" material but did not require the contact to be tight or at substantially all points.

In reviewing the Amendment, it appears that the applicant was distinguishing the '646 patent in two main respects:  (1) the '646 patent had brake pad segments composed of brake lining material which generally has a lower heat conducting capacity; and (2) the '646 patent's brake pads were allowed to move inwardly away from the interior surface of the drum, allowing them to retain a substantial quantity of heat within the interior of the drum.  Heuser Decl. Ex. B at 2, 4:17-24, 4:11-21, 5:4-10, 6:7-10, 7:6-7.  The Amendment does not illuminate the definition of "surface-to-surface."

Inventor Thomas Telford testified that the inventors "very deliberately in this patent design made sure that the stator in this case was in continuous contact around the circumference of the stator to the drum."  Heuser Decl. Supp. Ramsey Mot. for Summ. J. as to Claim Construction Ex. C at 134.

I agree with Warn that "constantly" modifies time and not space.  Moreover, the intrinsic evidence does not support Telford's explanation that the inventors wanted the stator to be in continuous contact with the drum around its entire circumference.  On the other hand, there is no support for Warn's argument that close proximity is sufficient, even if it would allow heat conduction from the stator to the drum, albeit it less efficiently.  Further, with the specification's acknowledgment that heat expansion will change the fit, I do not agree that the contact must be defined to be "tight" because that would have to be the case even when the device was cold.

Thus, I again construe the disputed term differently than either party. I conclude that "cylindrical outer surface constantly in surface-to-surface contact with a cylindrical inner surface of the drum" is defined as "a cylindrical outer surface in physical contact at all times but in a varying number of points with a cylindrical inner surface of the drum."

D.     "Heat Conductive Cylinder"

Ramsey contends that "heat conductive cylinder" should be defined as "a solid cylindrical object formed of heat conductive material." Ramsey argues that any fragmentation of the cylinder would compromise the efficiency of the heat transfer. It also notes that the claims must be read to require a single cylinder and not an assembly of parts: "*a* heat conductive cylinder" in Claim 1 and "braking pads, one on each side of *the* cylinder" in dependent Claim 2. '255 Patent, 5:13 and 5:25 (emphasis added).

Warn contends that a "heat conductive cylinder" should be construed as "any cylindrical part or assembly of parts whether solid or hollow made from a heat conducting material." In particular, Warn argues that Ramsey's limitation that the cylinder must be solid, namely made from one piece, is not addressed anywhere in the patent or the prosecution history. Warn agrees that an objective of the invention is to better dissipate the generated heat but argues that there is no limitation that only the most efficient design to do so is claimed.

As quoted above from the specification, the stator is an extension of the drum so that the head is conducted from the end faces through the stator material to the drum's outer surface and out to the atmosphere. '255 Patent, 2:18-21, 4:42-45.

In differentiating the '255 invention from the '646 invention, the '255 specification states:

Page 11 - OPINION AND ORDER

> The brake pads [of the '646] are heat insulators and thus the heat created between the shoes and pads is retained within the mechanism. Under severe loads this can be a problem and an objective herein is to facilitate heat dissipation with an improved design over that of the '646 disclosed embodiment.

'255 Patent, 1:62-67.

Ramsey contends that the prosecution history is additional evidence that the heat conductive cylinder is a solid metallic object functioning to transfer heat efficiently. Heuser Decl., Ex. B at 4:18-24, 7:2-7.

Again, it is clear from the '255 patent itself, as well as the cited prosecution history, that efficient heat dissipation is a primary objective of the invention. If the inventors intended to cover a cylinder assembled from multiple sections, they could have so claimed. Further, using Warn's definition, there is no limitation on any gap between the assembly of parts forming the cylinder. The gap could be so large that the heat conducting properties are lost. I also note the claim language of "*a* heat conductive cylinder," rather than language allowing an assembly of parts. '255 Patent, 5:13-14.

At first I was concerned with Ramsey's proposed definition of a "solid" cylindrical object because in the claim, "said cylinder further having a center opening and a brake shaft extended through said center opening." '255 Patent, 5:21-22. The core must be hollow. But I now realize that the center opening is already provided for later in the claim.

I conclude that the cylinder must be a single piece from end to end and not an assembly of parts with gaps in the interior. Thus, I define "heat conductive cylinder" as "a solid cylindrical object formed of heat conductive material."

Page 12 - OPINION AND ORDER

E.  "End Faces"

Ramsey contends that "end faces" should be defined as "exterior surfaces defining the ends of a structure." Ramsey notes that the claim uses the words "face" and "surface" interchangeably: "[a cylinder,] and having opposed end faces, one of which is disposed in a plane normal to the axis of the drum, said one end surface providing the brake surface . . . ." '255 Patent, 5:15-18. Because the end face provides a surface for braking, Ramsey contends that it cannot be located internal to the structure because it could not engage the brake pads there.

Warn contends that "end face" should be construed as an "outward facing planar surface." Warn observes that in the claim, the function of the end face is to be "the brake surface whereby axial movement of the braking member produces surface-to-surface braking engagement." '255 Patent, 4:18-20. Warn notes that the '255 patent uses the word "end" throughout to mean the end portion as opposed to the middle, and not to mean the outermost edge of the structure. As an example, Warn points to Figure 2, described in the specification as:

> the winch includes a cable drum 10 that is supported in the winch housing at its ends by bushings 13 . . . .

'255 Patent, 2:45-48. The bushings are at the end portions of the drum but are inset slightly from the very endpoint of the drum structure.

From the specification:

> The cylindrical end faces of the stator define the braking surfaces.

'255 Patent, 2:6-7.

> Cylindrical faces 80, 82 at each end provide braking surfaces.

'255 Patent, 4:2-3.

Page 13 - OPINION AND ORDER

> The cam actuator 56 and cam follower 48 have abutting end faces 68, 70 respectively that are cam shaped as illustrated in Fig. 3.

'255 Patent, 3:43-44.

The specification also contemplates two end faces on the stator, and not more. '255 Patent, 2:17-18 ("to affect equal braking action of both pads against the two end surfaces of the stator").

I reviewed Research Plastics, Inc., 421 F.3d at 1297 (construing "rear end" of a tube to mean "a reference point defined by the rear edge of the tube" and not an undefined area or region). It provides some support for Ramsey's construction, essentially that the word "end" must be given some meaning, with which I agree.

Claim 1 specifies a cylinder having opposed end faces. The plain meaning would be the two circular ends of a cylinder, which are opposed. The specification contemplates that one brake pad is fixed and the other brake pad is cammed into the braking surface of the stator which pushes the stator into the fixed brake pad "to affect equal braking action of both pads against the two end surfaces of the stator." '255 Patent, 2:8-19. Warn's proposed "outward facing planar surface" describes a more complicated mechanism because there could be more than two. The proposal also does not give meaning to "end."

I conclude that the term "end faces" is defined as "exterior surfaces defining the ends of a structure."

///


///

Page 14 - OPINION AND ORDER

## CONCLUSION

Ramsey's Motion for Summary Judgment as to Claim Construction (#40) is granted in part and denied in part. Ruling on the other pending motions is deferred because they address the infringement issue. As stated at oral argument, the parties will file simultaneous briefs on Friday, August 25, 2006 on whether the Ramsey 15000 infringes the '255 patent, based on my claim construction rulings. Response briefs will not be allowed. The parties do not need to refile exhibits already filed and may refer to those previous filings. I will only schedule further argument if I have questions after reviewing the new briefs.

IT IS SO ORDERED.

Dated this __11th__ day of August, 2006.

                                                  /s/ Garr M. King
                                                Garr M. King
                                                United States District Judge